PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES T. CARPENTER, III, | ) | |
| | ) | CASE NO. 4:15CV2584 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| J.P. MORGAN SECURITIES, LLC, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** [Resolving ECF No. 28] |

Pending before the Court is Defendant's Motion for Summary Judgment. ECF No. 28. Plaintiff responded (ECF No. 30) and Defendant replied (ECF No. 35). The Court has been advised, having reviewed the record, the parties' briefs, and the applicable law. For the following reasons, the Court grants Defendant's Motion for Summary Judgment.

## I. Stipulated Facts

Stipulated facts[1] follow:

1.     Plaintiff worked as a licensed Financial Advisor (FINRA Registered Representative) for Defendant beginning on March 4, 2010.

2.     Plaintiff is an African-American male.

3.     Plaintiff had not had any disciplinary write-ups prior to his termination.

4.     Central Supervision, also sometimes known as the Principal Review Desk, monitors Financial Advisors' compliance with various requirements.

_____

[1] *See* Proposed Findings of Fact by Stipulation of Parties (ECF No. 41).

5.      Thomas Peck was a Compliance Manager in Central Supervision.

6.      At the end of 2012 or beginning of 2013, Nick Brown took over as Plaintiff's Marketing Director.

7.      On May 20, 2013, Defendant terminated Plaintiff's employment.

8.      The Recommendation For Termination stated, in part, "I am recommending that Jamie Carpenter be terminated from employment because of failing to follow policies around document integrity as outlined in Section 7.4 of the Registered Rep. Manual."

9.      On May 28, 2013, Plaintiff appealed his termination through Defendant's appeal process.

10.     Plaintiff was replaced by a Caucasian employee.

## II. Background

Plaintiff James T. Carpenter, III, an African-American financial advisor, began working for Defendant, a wealth management firm, on March 4, 2010.  ECF No. 28 at PageID #: 805; ECF No. 30 at PageID #: 1130.  As a financial advisor, Plaintiff had two supervisors.  Nicholas Brown, a Marketing Director, oversaw day-to-day operations at various branches throughout Northeast Ohio.  ECF No. 28 at PageID #: 806; ECF No. 30 at PageID #: 1129.  Brown was considered Plaintiff's direct supervisor.  ECF No. 28 at PageID #: 806.   Additionally, Thomas Peck, a Compliance Manager (also referred to as a "Compliance Supervisor" or "Supervisory Manager") monitored transactions for compliance issues.  ECF No. 28 at PageID #: 806; ECF No. 30 at PageID #: 1129.  Peck worked in Defendant's Central Supervision department in

Columbus, Ohio, and assisted advisors throughout the region. ECF No. 28 at PageID #: 806; ECF No. 30 at PageID #: 1129.

In addition to these two supervisors, Plaintiff's transactions were reviewed by Central Supervision, a computerized supervision tool. ECF No. 28 at PageID #: 806. Plaintiff would submit completed documents to Central Supervision through its Principal Review Desk, which would flag information deficiencies or note areas of the paperwork needing clarification. ECF No. 28 at PageID #: 806; ECF No. 30 at PageID #: 1129. At times, advice between Brown, Peck, and Central Supervision conflicted, and Plaintiff would work with a supervisor to resolve the issues. ECF No. 30 at PageID #: 1129.

### A. Defendant's Branch Assignment and Termination

Plaintiff completed his initial training at Defendant's Poland branch, but began his work at the Warren branch. ECF No. 28 at PageID #: 805; ECF No. 30 at PageID #: 1130; ECF No. 35 at PageID #: 1655. A financial advisor's branch assignment can be significant. Advisors target customers with accounts at their assigned branch. ECF No. 30 at PageID #: 1130. Branches with more affluent customer bases could result in more business for the advisor. ECF No. 30 at PageID #: 1130 (citing ECF No. 31 at PageID #: 1202–03). Because he perceived the Warren branch's customer base to be less affluent and to have a higher percentage of minority customers, Plaintiff was disappointed by this transfer and believed the transfer was related to his race. *Id.* at PageID #: 1130.

Advisors could also seek additional work from other branches, and were allowed to have clients from any location. ECF No. 28 at PageID #: 805. In fact, while working at the Warren

branch, Plaintiff sought additional work from the Boardman and Liberty/Girard branches, which he considered "more financially promising."  ECF No. 30 at PageID #: 1131.

Plaintiff contends that in early 2013, Brown called Plaintiff and informed him that he was prohibited from covering the Liberty/Girard branch because he wanted Plaintiff to focus on the Warren branch.  ECF No. 30 at PageID #: 1131.  A week later, however, Plaintiff alleges that Brown directed Plaintiff to cover the Ravenna branch.  Id.  Plaintiff considered the Ravenna branch to be less desirable than the Liberty/Girard branch.  Id.  Plaintiff expressed his confusion at the conflicting orders.  Id.  Plaintiff alleges that Brown became upset, screamed at Plaintiff, and told Plaintiff that he was not "cut out for this job" and should do what is best for his family.  ECF No. 29-1 at PageID #: 844–45.

Defendant construes the assignments differently.  Defendant agrees that Plaintiff covered the Liberty branch, but notes that Plaintiff later applied to the open Liberty position.  ECF No. 28 at PageID #: 811.  Defendant argues that it was not Brown, but another supervisor, Erin Sardich, who supervised the Liberty branch and, ultimately, denied his transfer.  Id.  Brown did not control Liberty's staffing, or the prospects of Plaintiff's transfer to that branch.  Id.  Furthermore, Defendant contends that Brown offered Plaintiff the opportunity to cover Ravenna—a branch over which Brown did have authority—because its financial advisor had resigned, and Plaintiff would have inherited a large book of business.  Id.

Plaintiff's next interaction with Brown was four days after their discussion concerning coverage of the Ravenna branch, on May 19, 2013.  ECF No. 30 at PageID #: 1131.  Brown called Plaintiff and instructed him to be at a meeting the next day.  Id.  Peck also attended the

meeting *via* telephone.  *Id.* at PageID #: 1132.  Brown and Peck informed Plaintiff that he was being terminated for a document integrity issue that had occurred in March of 2013.  *Id.*  After exhausting his remedies before the Equal Employment Opportunity Commission, Plaintiff brought suit in state court for employment discrimination.  Defendant removed the case to federal court.

### B.  Document Integrity Issue

Defendant argues that it terminated Plaintiff for violating Defendant's document integrity policy.  The alleged incident involved an elderly client, over ninety years of age.  ECF No. 28 at PageID #: 808; ECF No. 30 at PageID #: 1132.  As members of the investment adviser and brokerage industry, Plaintiff and Defendant are subject to certain federal regulations.  ECF No. 28 at PageID #: 813.  Plaintiff was also subject to Defendant's internal "Registered Representative Manual," something he was required to review annually.  ECF No. 28 at PageID #: 807–08; ECF No. 30 at PageID #: 1139–40.  The manual includes a Document Integrity Policy, prohibiting advisors from "changing a document's information provided by a client, providing false information, or engaging in forgery."  ECF No. 28 at PageID #: 807.  The manual specifically prohibits employees from "cutting and pasting" multiple documents together to create a new document.  *Id.*  Clients must initial any changes to a document, or sign a new document.  *Id.*

Both the manual and the federal regulations require additional procedures when dealing with clients over the age of ninety.  *Id.*  Advisors must obtain special documentation for these

clients, including a "Client Cost Comparison Worksheet." *Id.* This worksheet sets out the fees between different mutual fund shares, and allows the client to compare different funds. *Id.*

In this instance, the nonagenarian client sought to transfer her IRA from another bank to Defendant so that she could invest in a mutual fund. *Id.* Plaintiff recommended that she invest $15,000 of her funds in Class C shares. ECF No. 30 at PageID #: 1132. The client agreed, and signed a Commission Disclosure Form in person, in front of Plaintiff, on March 25, 2013. ECF No. 28 at PageID #: 808. In compliance with Defendant's Policy and Procedure Manual, Plaintiff also prepared a Client Cost Comparison Worksheet, comparing the costs of this transaction with its alternatives. ECF No. 30 at PageID #: 1132. Plaintiff signed the Worksheet on March 25, 2013. *Id.* at PageID #: 1133.

Because of the client's age, Peck was alerted to review the transaction. ECF No. 28 at PageID #: 808. Peck looked through the file, reviewed the transaction, and discussed the transaction with the client over the telephone. *Id.*; ECF No. 30 at PageID #: 1133. Determining that she was well-informed, he approved the transaction. ECF No. 28 at PageID #: 808; ECF No. 30 at PageID #: 1133.

On April 22, 2013, Plaintiff received an email through the Central Supervision inquiry tool. ECF No. 28 at PageID #: 808; ECF No. 30 at PageID #: 1133. Central Supervision notified Plaintiff that his client's Commission Disclosure form was missing. ECF No. 28 at PageID #: 808. Plaintiff faxed the completed form to Central Supervision that day. *Id.* The next day, Central Supervision informed Plaintiff that the Commission Disclosure form's fee calculations were incorrect, and that he needed to correct and resubmit the paperwork. *Id.* at PageID #: 809;

ECF No. 30 at PageID #: 1133.  Plaintiff re-ran the cost comparison sheet and faxed it to Central Supervision, along with the other documents the client had completed.  ECF No. 28 at PageID #: 809; ECF No. 30 at PageID #: 1133.  These documents included the client's original signature page.  ECF No. 28 at PageID #: 809; ECF No. 30 at PageID #: 1133.  In reviewing the revised set of documents, Peck noticed that the client's file had multiple commission disclosure forms using the same client signature page.  ECF No. 28 at PageID #: 809.

Parties disagree over what happened next.  Plaintiff contends that on May 3, 2013, Central Supervision contacted Plaintiff, instructing him to have the client initial the changes or sign a new form.  Id.; ECF No. 30 at PageID #: 1133.  Given that the client was elderly, and that it was an error in favor of the client, Plaintiff contacted Peck to ask whether it was necessary to have the client return to the branch.  ECF No. 30 at PageID #: 1133.  Plaintiff alleges that Peck told Plaintiff to have the client sign a new form, and explain the situation to the client.  Id. at PageID #: 1134.

Defendant argues that when Peck noticed that the client's file had multiple commission disclosure forms, he contacted Brown.  ECF No. 28 at PageID #: 809.  Both agreed that Plaintiff had "cut and pasted" the client's signature, and decided to escalate the issue to higher management.  Id.  Brown and Peck agreed that Peck should discuss the matter with Plaintiff.  Id.  Peck alleges that he confirmed that Plaintiff had used the client's original signature page with a new commission disclosure form, and that Peck told Plaintiff his actions were a "fairly significant issue" that could result in disciplinary action.  Id. at PageID #: 810.

Parties agree that Plaintiff had the client come in and sign a new signature page, and that Plaintiff faxed the form with a new signature page to Central Supervision on May 7, 2013. *Id.* at PageID #: 810; ECF No. 30 at PageID #: 1134. Plaintiff was terminated on May 20, 2013. ECF No. 28 at PageID #: 810. In accordance with its regulatory obligations, Defendant completed FINRA Form U-5 notifying FINRA of Plaintiff's termination. As reason for termination, Defendant stated that "[The] [r]egistered rep corrected an inaccuracy on a customer disclosure form and attached the original signature page to the corrected form." *Id.*

### III.  Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure of materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

After the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of material facts in dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of

material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must evaluate whether the evidence could persuade a reasonable fact finder that the non-moving party is entitled to a verdict. *Id.*

To defeat a motion for summary judgment, the non-moving party must "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily is not sufficient to defeat a motion for summary judgment. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990).

### IV. Plaintiff's Termination

In opposition to Defendant's Motion for Summary Judgment, Plaintiff argues that he has both direct and circumstantial evidence of discrimination, either of which can be used to prove discriminatory motive. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). For the following reasons, the Court finds that neither Plaintiff's direct nor his circumstantial evidence is sufficient to demonstrate discriminatory intent.

## A. Direct Evidence

Plaintiff contends that he has produced direct evidence of his discrimination. He highlights that Defendant employed "extremely few" African-American financial advisors in this region; that Plaintiff was repeatedly reassigned to serve less affluent and desirable branches because of his race; and that Brown told Plaintiff that he might not be cut out for the position. ECF No. 30 at PageID #: 1138.

Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was [the] motivating factor in the employer's actions . . . . It does not require the factfinder to draw any inferences to reach that conclusion." *Sharp v. Aker Plant Services Group, Inc.*, 726 F.3d 789, 798 (6th Cir. 2013) (citation omitted; internal quotations omitted). "Only the most blatant remarks, whose intent could be nothing other than to discriminate" will constitute direct evidence. *Id.* (quoting *Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006)). At the summary judgment stage, a plaintiff must show by a preponderance of the evidence that race "was the 'but-for' cause of the challenged employer decision." *Id.* (citing *Bartlett v. Gates*, 421 F. App'x 485, 488–89 (6th Cir. 2010)). "General, vague, or ambiguous comments do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus." *Id.* (quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008)).

The facts and statements Plaintiff offer do not constitute direct evidence of racial discrimination. Plaintiff's only support for his argument that Defendant employed "extremely few" African-Americans are the statements of Ronald Hefner, a private client advisor who

worked for Defendant.  Hefner testified that he only remembered working with two

African-Americans during his employment with Defendant.  ECF No. 31 at PageID #: 1204–05.

Hefner's recollection of his personal experience is not direct evidence of Defendant's

discriminatory intent.  Plaintiff does not include evidence that, for example, the lack of

African-American employees was the result of Defendant's discriminatory policy, or even

evidence that this lack of diversity existed in other areas of the company.  Moreover,

"[c]omments made by individuals who are not involved in the decision-making process regarding

the plaintiff's employment do not constitute direct evidence of discrimination." *Carter v. Univ.*

*of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) (citing *Hopson v. DaimlerChrysler Corp.*, 306 F.3d

427, 433 (6th Cir. 2002)).  Because Hefner was Plaintiff's peer, and not in a decision-making

position, his statement is not direct evidence of discrimination.

      Plaintiff's other evidence is similarly deficient.  Although he contends that his

reassignment to different branches was on the basis of race, his only evidence that these

reassignments were racially motivated are his own statements, based only on his personal

perceptions of the branches.  Such anecdotal evidence is not enough.  A court does not have to

accept a plaintiff's bald assertions and conclusory statements as proof of defendant's

discrimination.  *Hill v. A.O. Smith Corp.*, 801 F.2d 217, 222 (6th Cir. 1986); *see also Hartsel v.*

*Keys*, 87 F.3d 795, 801 (6th Cir. 1996); *Klepper*, 916 F.2d at 342.  Plaintiff has not sufficiently

demonstrated that the target customer bases of these branches were different, and more

important, that his reassignment (or later denial of transfer) was the result of discriminatory

behavior.

Finally, Brown's statements that Plaintiff was not cut out for his position and that he should do what was best for him and his family requires an inference of discriminatory intent. Therefore, it does not constitute direct evidence. Brown's statement does not reference race, nor does Plaintiff provide any context that would indicate that Brown intended the statement to concern Plaintiff's race. *Compare Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642 (6th Cir. 2012) (finding employer's statement that he wanted to keep "the white girl" to be sufficient direct evidence to survive summary judgment) *with Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (finding that employer's comments expressing concern over the potentially detrimental effect on business of having an African-American comanager, remarks concerning plaintiff's lack of ability and initiative and his intellectual shortcomings were not direct evidence of discrimination).

For these reasons, the Court finds that Plaintiff has failed to show direct evidence of discrimination.

**B. Circumstantial Evidence**

In the absence of direct evidence, discrimination can also be demonstrated through circumstantial evidence. Circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). When a plaintiff presents circumstantial evidence, the three-step framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) guides the court's analysis.

*Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998).

In the first step, the plaintiff must present evidence sufficient to establish a *prima facie* case of discrimination. *Ercegovich*, 154 F.3d at 350. This burden is easily met, and is not intended to be onerous. *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987); *Tx, Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To satisfy the *prima facie* case, the plaintiff must prove by a preponderance of the evidence that (1) plaintiff is a member of a protected group; (2) plaintiff was subjected to an adverse employment decision; (3) plaintiff was qualified for the position; and (4) plaintiff was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253–54; *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009).

If the plaintiff establishes the *prima facie* case, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Lefevers*, 667 F.3d at 725. If the employer meets this burden, the burden shifts back to the plaintiff to show that the employer's nondiscriminatory explanation is a pretext for discrimination. *Id*. To rebut the employer's nondiscriminatory explanation for termination and survive summary judgment, the employee must produce "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [the employee]." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009). A plaintiff can accomplish this by proving "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not

(4:15CV2584)

actually motivate the employer's action, or (3) that they were insufficient to motivate the

employer's action." *Id.*

 This three-part inquiry establishes "an allocation of the burden of production and an order

for the presentation of proof" in employment discrimination cases. *Cline v. Catholic Diocese of*

*Toledo*, 206 F.3d 651, 559 (6th Cir. 2000) (internal quotations omitted).  The burden of

production shifts between litigants as the analysis advances. *Provenzano v. LCI Holdings, Inc.,*

663 F.3d 806, 812 (6th Cir. 2011).  At all times, however, "the ultimate burden of persuasion

remains on the plaintiff to demonstrate that [membership in the protected class] was the 'but-for'

cause of [the] employer's adverse action." *Id.*

### i. Step One: *Prima Facie* Case

 Parties agree that Plaintiff has met *McDonnell Douglas*' first step by establishing a *prima*

*facie* case of discrimination regarding his termination.[2]  ECF No. 28 at PageID #: 813;

---

 [2]  Ohio law treats discrimination and retaliation claims separately, reasoning that
because "Ohio's antidiscrimination laws contained in R.C. Chapter 4112 are modeled
after Title VII," Congress' "intentional separation of status-based discrimination claims
from conduct-based retaliation claims in two separate provisions of Title VII" applies to
Ohio's statute, even though both types of claims are set forth in a single section of the
Ohio Revised Code.  *See Wholf v. Tremco, Inc.*, 26 N.E.3d 902, 908 (Ohio Ct. App.
2015).  Plaintiff pled only a claim of "Racial Discrimination," so while a fairly broad
reading is that he also alleged (without clear articulation in the Complaint) discriminatory
transfer, that broad reading reasonably does not include retaliation.  Although Plaintiff
speaks about transfers given or denied in his Response, Plaintiff did not properly plead
retaliation resulting from transfers given or denied.  In his Response, however, Plaintiff
argues that his termination was the result of his objections to discriminatory transfers.
ECF No. 30 at PageID #: 1128.  That is the first time Plaintiff raises this retaliation
theory.  He did not plead such a claim in his Complaint.  *See* ECF No. 1.  Plaintiff cannot
amend his Complaint at the summary judgment phase to add this claim.  *Roeder v. Am.*
(continued...)

(4:15CV2584)

ECF No. 30 at PageID #: 1137-9.  As an African-American, Plaintiff is a member of a protected class.  Plaintiff was qualified for his job, and suffered an adverse employment action when he was terminated.  His position was filled by a person outside of the protected class—a Caucasian employee—satisfying the fourth prong of the *prima facie* case.

### ii.  Step Two: Nondiscriminatory Explanation

In *McDonnell Douglas*' second step, Defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action, "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *White v. Duke Energy-KY*, 603 F. App'x 442, 447 (6th Cir. 2015) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)).  The employer only has the burden of production, and is not required to persuade the factfinder that its stated reason is likely true. *Burdine*, 450 U.S. at 254–55.

Defendant has demonstrated legitimate, nondiscriminatory reasons for Plaintiff's termination, contending that it terminated Plaintiff for violating "policies around document integrity as outlined in Section 7.4 of its Registered Representative Manual." ECF No. 28 at PageID #: 814.  Defendant's Document Integrity policy is consistent with FINRA Rule 2010,

---

²(...continued)
*Postal Workers Union, AFL-CIO*, 180 F.3d 733, 737 n.4 (6th Cir. 1999) (refusing to consider claims not pleaded in the Complaint and raised, for the first time, on summary judgment).  Therefore, Plaintiff's declaration that "Defendant has conceded that Plaintiff established a *prima facie* race discrimination case" is only partially correct.  ECF No. 30 at Page ID #1139.

which prohibits using copied and pasted client signatures. *See In the Matter of Robert P. Gulan, Respondent (AWC 2011027925201, Feb. 7, 2013)* (FINRA Letter of Acceptance, Waiver and Consent admitting violation of FINRA Rule 2010 for cutting and pasting client signatures). Terminating an employee for failure to follow company policy is a legitimate, nondiscriminatory reason. *See Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 168 (6th Cir. 1996) (finding that defendant's evidence that plaintiff was discharged for violating the nursing home's policy, which was known to her, was a legitimate, nondiscriminatory reason); *Idemudia v. J.P. Morgan Chase, 434 F. App'x 495, 502 (6th Cir. 2011)* (terminating employee for failure to follow policy and procedure was a legitimate, nondiscriminatory reason).

Accordingly, the Court finds that Defendant's articulated reason for termination satisfies step two of *McDonnell Douglas*.

### iii. Step Three: Pretext

In step three of the *McDonnell Douglas* analysis, the burden shifts back to the plaintiff. *Burdine* 450 U.S. at 256. A plaintiff must now demonstrate that the defendant's legitimate, nondiscriminatory reason was pretextual. "To demonstrate pretext, a plaintiff may show that the defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) (quoting *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003)).

(4:15CV2584)

### a. Basis in Fact

Plaintiff first argues that Defendant's reason was "false," and, therefore, has no basis in fact.  ECF No. 30 at PageID #: 1139.  To demonstrate that Defendant's reason has no basis in fact, a plaintiff must show that the basis for plaintiff's discharge did not happen.  *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 502 (6th Cir. 2007) (citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds*, *Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009)).  Otherwise put, a plaintiff must show that the defendant's reason was "factually false."

By his own admission, Plaintiff attached the client's signature page to a different document.  ECF 30 at PageID #: 1133–34 (citing Plaintiff's Deposition during which he admitted "fax[ing] [the revised form] with the old original signature sheet."); *see also* Deposition Exhibits 11 and 12 (the original and revised forms with same signature page).  Moreover, Plaintiff does not deny that Defendant had a document integrity policy.  Rather, Plaintiff admits that he reviewed the policy annually.[3]  ECF No. 28 at PageID #: 807–08; ECF No. 30 at PageID #: 1139–40.  Therefore, Plaintiff's argument that Defendant's proffered reason has no basis in fact is without merit.

---

[3]  Although he admits that he was required to review the company policies each year, Plaintiff also contends that "[f]ocus on rules and policies would come and go based on Defendant's performance in recent audits."  ECF No. 30 at PageID #: 1139–40.  This observation is of no significance to the analysis.

**b. Insufficient to Justify Termination**

Plaintiff also argues that Defendant's proffered reason was insufficient to justify his termination. "When showing that a proffered reason for a termination was pretextual, a plaintiff can rely on 'evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" *White*, 603 F. App'x at 447 (citing *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008)). "The employees to whom the plaintiff seeks to compare himself must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Plaintiff offers Ronald Hefner as a similarly situated Caucasian male employee who received dissimilar treatment after a rule infraction. ECF No. 30 at PageID #: 1141. Hefner had a client sign an incomplete form, but did not use it to complete a transaction. ECF No. 31 at PageID #: 1157; ECF No. 35 at PageID #: 1658. Hefner contends that the client began to fill out the form, but when he realized they did not need it, it was set aside and was put back in the client's file. ECF No. 31 at PageID #: 1159. Plaintiff contends that Hefner's behavior was "much more egregious" than his own, yet Hefner only received a "letter of education." ECF No. 30 at PageID #: 1141.

Hefner's infraction is sufficiently dissimilar from Plaintiff's. Unlike Plaintiff, Hefner did not use his rule-breaking form. Hefner, therefore, cannot serve as a comparator. Defendant

provides, however, several examples which are comparable—examples of employees copying a client's signature page, using it in a transaction, and being terminated as a result, like Plaintiff. These examples demonstrate that Plaintiff's termination for copying a client signature page was consistent with Defendant's policies. For example, when Hefner later engaged in the frowned upon "copy and pasting" behavior by having a client sign one transfer form and then attaching the form to multiple transfers, his behavior was similar to Plaintiff's. Then, Hefner was also terminated. ECF No. 27 at PageID #: 122; ECF No. 31 at PageID #: 1188, 1190. In another similar situation, Brown terminated a female Caucasian employee for photocopying a signature page and attaching it to another document. ECF No. 23-1 at PageID #: 123–24. Brown also terminated another male Caucasian employee for photocopying a signature page. *Id.* at PageID #: 128–29.

Plaintiff opines that having a client sign an incomplete form was actually much more egregious than his own behavior. ECF No. 30 at PageID #: 1141. He offers nothing but his own opinion, and cannot point to, for example, a portion of the Registered Representative Manual or a FINRA decision prohibiting this action. Moreover, this argument is irrelevant to the similarly-situated employee inquiry, as it is not the role of the Court to "to act as a super personnel department that second guesses employers' business judgments." *Correll v. CSX Transp., Inc.*, 378 F. App'x 496 (6th Cir. 2010) (quoting *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 399 (6th Cir. 2009)).

For these reasons, the Court finds that Plaintiff's argument lacks merit.

### c. Actual Motivation

Finally, Plaintiff argues that Defendant's proffered reason did not actually motivate his termination.  "In this type of showing, 'the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant.  In other words, the plaintiff argues that the sheer weight of the circumstantial evidence [of discrimination] makes it "more likely than not" that the employer's explanation is a pretext, or coverup.'"  *Singleton v. Select Specialty Hospital–Lexington, Inc.*, 391 F. App'x 395 (6th Cir. 2010) (citing *Manzer*, 29 F.3d at 1084).

Even when viewed in the light most favorable to Plaintiff, he has not produced sufficient evidence for a reasonable jury to find that his termination was not actually motivated by the document integrity issue.  As discussed above, Plaintiff committed a document integrity violation.  Defendant has terminated several Caucasian, non-minority employees for the same reason.  Urging his point, Plaintiff cites his denied transfer; a comment by Brown that Plaintiff might not be cut out for the position; and an "implied threat" that Plaintiff should do what was best for his family.  ECF No. 30 PageID #: 1141–42.  Plaintiff provides no statistics backing up the disadvantageous or advantageous nature of the transfers denied or given.  He provides little context for Brown's statements, yet asks that the Court read into them racial animus.  These offerings are insufficient to demonstrate that Defendant discriminated against Plaintiff.  *Klepper*, 916 F.2d at 342 (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The non-movant, in order to prevail . . . must

show sufficient evidence to create a genuine issue of material fact. The showing of a mere scintilla of evidence is insufficient[.]")

For these reasons, the Court finds that Plaintiff's argument lacks merit.

### iv. Summary

For the foregoing reasons, the Court finds that there is no triable issue regarding Plaintiff's termination prohibiting summary judgment in favor of Defendant, and that a claim for discriminatory retaliation is not properly before the Court.

## V. Plaintiff's Branch Assignment

Even when given its broadest interpretation, the Complaint complains of *less* than Plaintiff's Response to the Motion for Summary Judgment. *Compare* ECF No. 1-1 *with* ECF No. 30. Plaintiff's Complaint broadly alleges that he was "discriminated against . . . on the basis of his race, in violation of R.C. § 4112 *et seq.*", but only discusses his termination, making no mention of his transfer. ECF No. 1-1 at PageID #: 9, ¶ 21. Plaintiff's Response complains of discriminatory termination, transfer *and* retaliation. ECF No. 30. As discussed above, Defendant is given no notice of a claim of retaliation until Plaintiff's opposition to summary judgement.[4] This is insufficient notice. To permit amendment of the Complaint at this juncture

---

[4] Ohio law treats discrimination and retaliation claims separately. *See Wholf*, 26 N.E.3d at 908. Plaintiff only pleaded a claim of "Racial Discrimination", so a fairly broad reading of the Complaint is that he also alleges (without clear articulation in the

(continued...)

21

would be problematic and futile, based on the current record.  *See Roeder, supra*; *see also*

*Despariois v. Perryburg Exempted Village Sch. Dist.*, 455 F. App'x 659, 665 (6th Cir. 2012)

(citing *In re Hood*, 319 F.3d 755, 760 (6th Cir. 2003)) (finding that plaintiff waived arguments

on appeal when the claims were not explicitly included in his amended complaint, and arguments

were raised for the first time in opposition to summary judgment).  In his Response, Plaintiff

drills down on the theory that Defendant discriminated against him through his branch

assignment.  Because the issue of discriminatory transfer or denial of transfer is subject to the

same law and analysis as that for discriminatory termination, the analysis above is incorporated

here.

In summary, Plaintiff has not demonstrated direct evidence of discriminatory transfer or

denial of transfer.  As discussed above, Plaintiff's only evidence that his assignments were

racially motivated are his own statements, based on his personal perception of the branches.  The

Court does not accept Plaintiff's bald assertions and conclusory statements as direct proof of

Defendant's discrimination.  *Hill v. A.O. Smith Corp.*, 801 F.2d at 222.

Nor has Plaintiff demonstrated discrimination through circumstantial evidence.  First,

Plaintiff has not established a *prima facie* case of discrimination under *McDonnell Douglas*.

Plaintiff argues that "[f]rom the moment he was hired on the understanding that he would be

---

[4](...continued)
Complaint) discriminatory transfer.  Plaintiff did not properly plead *retaliation* resulting
from transfers given or denied.  Plaintiff's declaration, therefore, that "Defendant has
conceded that Plaintiff established a *prima facie* race discrimination case" remains only
partially correct.  ECF No. 30 at Page ID #1139.

assigned to an affluent suburban branch and was instead reassigned to a poor urban branch, Defendant's discriminatory motives were apparent." ECF No. 30 at PageID #: 1141.  Earlier, the Court remarked that Plaintiff provides, for example, no statistics backing up the disadvantageous or advantageous nature of the transfers denied or given.  He has proffered no evidence that this action was adverse, by, for example, demonstrating that the branches had disparate earning potentials, or even differences in his own earnings from his work at various branches.  Plaintiff fails to show that Defendant's action was an adverse employment action, the second element of the *prima facie* case.

Furthermore, Defendant has offered a legitimate, nondiscriminatory reason for his assignment, satisfying *McDonnell Douglas*' second step.  Defendant contends that Plaintiff temporarily covered this branch after its financial advisor left, until the position could be filled. ECF No. 28 at PageID #: 811; ECF No. 35 at PageID #: 1655, n.3.  After the position was filled, Plaintiff's coverage stopped.  Additionally, the Liberty/Girard branch fell within a different marketing director's market, and Brown had no power to transfer Plaintiff to that branch.  ECF No. 28 at PageID #: 811.

Finally, Plaintiff does not rebut Defendant's proffered reason with evidence of pretext. Accordingly, to the extent Plaintiff alleges discrimination regarding a transfer granted or denied, the Court finds that Plaintiff has failed to demonstrate triable issues prohibiting summary judgment in favor of Defendant.

(4:15CV2584)

## VI.  Conclusion

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment.

The Final Pretrial Conference scheduled for July 5, 2017, and the Trial scheduled for July 24,

2017, are cancelled.

IT IS SO ORDERED.

 July 5, 2017                               */s/ Benita Y. Pearson*
Date                                        Benita Y. Pearson
                                           United States District Judge